AMERICAN COAST LINE, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

No. 80, Docket 20301.

Circuit Court of Appeals, Second Circuit.

Feb. 3, 1947.

4 Sidney Blumenthal & Co. Inc. v. Atlantic Coast Line R. Co., 2 Cir., 139 F.2d 288, 290.

5 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

666

Howe P. Cochran, of Washington, D. C. (Paul L. Clugston, of New York City, Margaret F. Luers and Betty C. Stockvis, both of Washington, D. C., and James F. Ouchterloney, of New York City, of counsel), for petitioner.

Carleton Fox, of Washington, D. C., Sewall Key, Acting Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to Atty. Gen., for respondent.

Before L. HAND, CHASE and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order of the Tax Court which assessed a deficiency in excess profits tax against the petitioner for the year 1940, and dismissed its petition for lack of jurisdiction, so far as it sought relief under § 722.[1] Two questions arise: (1) Whether any excess profits tax was due for the year 1940; and (2), if so, whether the Tax Court had jurisdiction to entertain an application for relief under § 722(d) of the Internal Revenue Act.[2] The facts are as follows. The petitioner is a corporation organized in 1933, all of whose 100 shares were held in 1939 by the "Prudential Steamship Company." The wife of Stephen D. Stephanidis owned two-thirds of the shares of the Prudential Steamship Company, and Nicholas D. Allen owned the other third; the shares had been transferred to the Prudential Company as security for a loan, but this had been paid at or before the time here in question. The corporation had at one time been in business, but had been wholly inactive since 1935; it had kept alive as a corporation by paying its franchise taxes but it had filed no income tax returns. In July, 1939, Stephanidis, Allen and two others, decided to revive it in order to take title to a ship which they proposed to buy and operate. The Prudential Steamship Company—i. e., Stephanidis and Allen—surrendered their certificates for 100 shares; the capital was increased to 600 shares; and 150 shares were issued to Stephanidis, to Allen and to each of the other two. (Stephanidis' shares were issued in the name of his wife as the original 100 had been.) The corporation spent about $6000 in repairs and operated the ship at a loss during the last part of 1939 and the early part of 1940. On March 15, 1940, it sold her to the British Government for $400,000, title being transferred on June 7th at a profit of $287,000. The corporation during the years when it was active had filed its income tax returns on the basis of the calendar year. This it wished to change; and on May 7, 1940, it asked leave of the Com-

---

[1] § 722, Title 26, U.S.C.A.Int.Rev. Code.

[2] § 722(d), Title 26 U.S.C.A.Int.Rev. Code.

missioner to file on the basis of a fiscal year from July 1, 1939, to June, 1940, which would have exempted it from the excess profits tax. The Commissioner granted leave, but on certain conditions with which the corporation never complied; and on March 15, 1941, it filed its income tax and excess profits tax returns upon a calendar year for the years 1939 and 1940, as it had always done in the past. The Commissioner mailed to it a "preliminary deficiency notice" on December 18, 1941, assessing the whole profit from the sale as subject to the excess profits tax; the corporation protested on January 2, 1942, and filed an "application" for relief under § 722[3] on March 14, 1942. The Commissioner had several conferences with it, but mailed a "notice of deficiency" on September 29, 1942; and the corporation filed its petition with the Board on December 26, 1942.

■ The petitioner's first point is that the corporation, having for all practical purposes been long moribund, became a new corporation when it was revived in July, 1939, and, as such had the privilege, without the Commissioner's leave, of fixing a fiscal year instead of a calendar year, unlike a corporation which had already used a calendar year. This argument is unsound on its face; every act of the shareholders contradicted it. They cancelled the old shares, increased the capital of the corporation, took new shares for themselves, put the title of the ship in the corporation, asked leave to change its fiscal year, and filed a return for the whole year, 1939. Nothing could more clearly prove that they meant to avoid the expense of forming a new corporation, and proposed to make use of the old one. The excuse, which they attempted to make at the trial, that they thought they were making a new corporation, and merely signed such papers as their lawyer told them, is plainly untenable; as Judge Murdock said in the court below: they "have not a leg to stand on."

The second question is whether the Tax Court was without jurisdiction to review the Commissioner's denial of the benefits of § 722, a question quite different from the merits of the Commissioner's action. The section as a whole was intended to relieve corporations from the harsh results of applying the excess profits tax to situations in which the "excess profits tax credit" even with the assistance of § 721 was not adequate protection. In 1940 when the tax was first passed (Second Revenue Act 1940, 201, 26 U.S.C.A. Int.Rev.Acts, p. 35), § 722 merely provided in general terms that the Commissioner might relieve corporations from "abnormal" results, and that the Board of Tax Appeals—as it then was—should have jurisdiction to review his decision. In 1941 the section was greatly enlarged so as to make more specific those situations to which it applied, and subdivision (e) was added, providing for the "Application for Relief Under This Section." Act March 7, 1941, § 6, 26 U.S.C.A. Int. Rev.Acts, page 84. This subdivision required the corporation to return its excess profits tax without regard to § 722; but gave the privilege within six months after the return was filed of making "application" to the Commissioner for the "benefits" of the section under appropriate regulations; it did not in terms require the corporation to pay the tax as a condition of making the "application." If the Commissioner denied the relief, it could not appeal to the Board but was forced to pay the tax as returned, to claim a refund and appeal to the Board under § 732. However, the Commissioner might assess a deficiency against the corporation, because it had returned too small a tax, or none at all; and this he might do either by a "preliminary notice" followed by an assessment, or without any notice. In either case subdivision (e) allowed the corporation to invoke the "benefits" of § 722 upon an appeal to the Board from the deficiency. If the Commissioner proceeded by "preliminary notice" the corporation might file an "application" to him within ninety days; if it did not, apparently it lost its privilege. In the case at bar the Commissioner did serve a "preliminary notice" and the corporation filed a timely "application." Since the Commissioner never passed upon the "application" except by assessing the deficiency on September 29, 1942, the Board had a jurisdiction to review his disallowance under § 722(e) (1) in the

---

[3] § 722, Title 26 U.S.C.A.Int.Rev. Code.

same proceeding in which it reviewed the deficiency. This is a necessary consequence of the language of the exception as a whole, because, unless the jurisdiction of the Board extended to cases within subdivision (e) (1), that subdivision hung in the air and the sentence did not even parse. If the Commissioner cut short the ninety days after his "preliminary notice," or gave none at all, an appeal to the Board also lay, but with these we are not concerned.

■ So the law stood until October 21, 1942, Revenue Act 1942, § 222 (a), 26 U.S.C.A. Int.Rev.Acts page 299, when subdivision (e) was renumbered (d), and was amended to provide that as a condition upon making any "application" to the Commissioner the corporation must not only "compute its tax" and "file its return," but "pay its tax * * * without the application of this section": i. e., § 722. This amendment was expressly made applicable retroactively to all taxes imposed after December 31, 1939, and therefore covered the tax at bar. Two questions arise. First, whether the corporation's appeal of December 26, 1942 was defective, assuming that the amendment of October 21, 1942, for the first time made payment of the tax assessed a condition as well upon appeals to the Board as upon "applications" to the Commissioner. Second, whether payment of the tax was in fact a condition as well upon appeals to the Board, as upon "applications" to the Commissioner. The right answer to the first of these questions is yes. It might perhaps be argued that, if before October 21, 1942, the corporation had appealed from the deficiency assessed on September 29, 1942, the amendment would not have deprived the Board of a jurisdiction already vested in it. That we do not answer; for there can be no doubt that, if it be once conceded that § 722(d) did make payment of the deficiency a condition upon the appeal granted by subdivision (d) (1) or (d) (2), all appeals taken after October 21, 1942, were subject to that condition, regardless of whether the deficiency to be reviewed had been assessed before payment had been made a condition either upon "applications" to the Commissioner or appeals to the Board.

■ The answer to the other question is not so plain: Should the condition of payment which the amendment imposed upon all "applications" to the Commissioner be understood as also applicable to appeals to the Board? Appeals to the Board lay only after the Commissioner had finally assessed a deficiency, because, as we have already implied, § 722(d) (1) presupposed that any "preliminary notice" has been followed by a definitive assessment. Since § 272(a) stayed process on an assessment, pending appeal to the Board, it is true that the assessment must be regarded as not final in the same sense that a judgment stayed on the appeal is not final. Moreover, there is no doubt a difference between a tax, conceded to be due in the corporation's own return, and a tax assessed against it in invitum. This argument might perhaps be persuasive, if the denial of "benefits" under § 722 were regarded as a constituent factor of the tax itself, as for example are the conditions detailed in § 721. We do not so regard § 722; on the contrary it was a favor; it presupposed that, even after taking into account the ameliatory conditions of § 721, the tax was due unless ex gratia the blow was softened; it was a tempering of the wind to the shorn lamb. When Congress imposed as a condition upon such a favor, and expressly prescribed that the recipient must not be in default as to what it acknowledged to be due, we can hardly believe that it meant to relieve those of the same condition who had wrongly, even though honestly, failed to acknowledge what in fact was due, merely because their liability had not been finally determined on an appeal. Moreover, we think it not unimportant as disclosing a pre-existing purpose that by the amendment of 1943 Congress denied the "benefits" of § 722 in all cases where the amount of the tax as assessed was not paid; and wholly assimilated the situation to a claim for refund. It is not unfair to regard the earlier statutory steps, though inarticulate, as successive efforts to realize an object already in mind.

■ Finally, so far as concerns our review of the Tax Court, as distinct from its own decision as to its jurisdiction, the case seems to us especially proper for the application of the doctrine that, even as to matters of law unmixed with fact, we are to yield unless our conviction to the con-

trary is strong. In Brooklyn National Corporation v. Commissioner,[4] the Tax Court had refused to follow our earlier decisions on the point involved, saying with engaging candor that they thought us mistaken. Relying upon our earlier decision in Kirschenbaum v. Commissioner,[5] in which we had followed Commissioner v. Estate of Bedford,[6] we deferred to that ruling. It is of course not our province to fix the distribution of judicial power; least of all are we in a position to measure the higher authority which the Tax Court's constant occupation in its special field should give to its rulings, as distinct from ours in our sprawling jurisdiction. We can think of no legal question as to which we ought more readily yield than that at bar; in that thicket of verbiage, through which we have been forced to cut a way, it must surely be an advantage to have been familiar with other tangles of the same general sort; and, while it is the pleasure of Congress to express itself so apocalyptically, we may well be grateful that we are permitted to put our hand into those of accredited pathfinders.

Order affirmed.

---

[4] 2 Cir., 157 F.2d 450.
[5] 2 Cir., 155 F.2d 23.

[6] 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611.