FRANK J. AMBROSE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29340.   Promulgated June 30, 1952.

*Harry Silverson, Esq., Joseph Rosenthal, C. P. A.,* and *Burton L. Shepard, Esq.,* for the petitioner.

*Francis J. Butler, Esq.,* for the respondent.

692

OPINION.

HARRON, *Judge:* The question is whether the petitioner is entitled, under section 124 (d) (4) of the Code, to have income tax for 1943 recomputed to give effect to a retroactive revision of the amount of the amortization deduction on the emergency facility which he owned. He owned the property in 1945 for a period of 6 months until it was taken by the United States Government under condemnation proceedings on

June 7, 1945, and in his income tax return for 1945 he computed the amortization deduction on the basis of an amortization period of 32 months, *i. e.*, from February 1943, to and including September 30, 1945, which latter date was the end of the emergency period as defined in section 124 (e) (2). Section 124 (d) (1) of the Code provides that a taxpayer may elect to terminate the amortization period with respect to an emergency facility as of the end of the month in which the presidential proclamation ending the emergency period occurred. Section 124 (d) (4) of the Code provides the method for making the election under section 124 (d) (1). Regulations 111, section 29.124–5–(e), page 531, sets forth the steps to be taken in order to make an election under section 124 (d) (1). The petitioner complied with the Commissioner's regulation by filing a written statement of his election with the Commissioner on November 21, 1945. Also, the petitioner, in his income tax return for 1945, actually computed the amount of the amortization deduction with respect to the emergency facility on the basis of an amortization period of 32 months rather than 60 months. The provisions of section 124 (d) (1) and 124 (d) (4) are set forth in the margin.[5]

Although the question to be decided relates only to the year 1943, the year before us in this proceeding, the issue will affect the year 1944 if the question is decided for the petitioner.

The respondent has determined that the petitioner did not have the right to make the election under sections 124 (d) (1) and (4) because he did not own the emergency facility at the end of the emergency period, September 30, 1945.

The petitioner, prior to 1943, conducted an aviation training school which was located on leased property. He had a contract with the

---

[5] Section 124 (d) (1): TERMINATION OF AMORTIZATION PERIOD.—If the President has proclaimed the ending of the emergency period (as defined in subsection (e)), or if the Secretary of War or the Secretary of the Navy has, in accordance with regulations prescribed by the President, certified to the Commissioner that an emergency facility ceased, on the date specified in the certificate, to be necessary in the interest of national defense during the emergency period, and if the date of such proclamation or the date specified in such certificate occurs within sixty months from the beginning of the amortization period with respect to such emergency facility, then the taxpayer may elect (in accordance with paragraph (4) of this subsection) to terminate the amortization period with respect to such emergency facility as of the end of the month in which such proclamation was issued or in which occurred the date specified in such certificate, whichever is the earlier. In such case the amortization period with respect to such facility shall end with the end of such month in lieu of the end of the sixty-month period.

Section 124 (d) (4): The election provided in paragraph (1), (2), or (3) shall be made by filing with the Commissioner, in such manner, in such form, and within such time, as the Commissioner with the approval of the Secretary may by regulations prescribe, a statement of such election. When such election has been so made, then, under regulations prescribed by the Commissioner with the approval of the Secretary, the taxes for all taxable years, beginning with the taxable year in which the amortization period began, shall be computed in accordance with an amortization deduction computed in accordance with the method provided in subsection (a), but using (in lieu of the sixty-month period provided in such subsection) the amortization period specified in paragraph (1), (2), or (3), as the case may be.

United States Army for the training of soldiers at his school. He gave consideration to the matter of investing his capital in the property. Before he did so, he was granted a Necessity Certificate by the War Department which certified that the property was necessary in the interest of national defense during the emergency period. He invested his capital in the property in January 1943, and he elected, in his income tax return for 1943, to take amortization deductions under section 23 (t) in lieu of depreciation deductions over the useful life of the property under section 23 (l). He computed the amortization deduction for 1943 on the basis of an amortization period of 60 months under sections 124 (a) and (b). He held the emergency facility during all of 1943, 1944, and 6 months of 1945. He gave up the property involuntarily when the Government took it through condemnation proceedings on June 7, 1945. He was entitled to take amortization deductions under section 23 (t) for as long as he owned the property. In this proceeding we have a very narrow question. Although the issue arises in connection with the determination of the tax for 1943, it is necessary to consider what right, if any, the petitioner had with respect to computing his amortization deduction for the 6 months of 1945 during which he held the property. He did not own the property on September 30, 1945, the end of the emergency period. Under the facts, the narrow aspect of the question is whether ownership of the property during part of 1945, but not on the date of the end of the emergency period in 1945, suffices in applying the provisions of sections 124 (d) (1) and (4).

The view of the respondent, under the facts of this proceeding, represents a very narrow interpretation of all of the provisions of section 124 of the Code, and means that a taxpayer who made the election under sections 124 (a) and (b) to amortize the cost of an emergency facility over a period of 60 months cannot make any adjustment of the amortization period so as to have it terminate as of the end of the emergency period, September 30, 1945, unless he owned the emergency facility on that date, even though he owned the emergency facility during the year in which the emergency period ended. This view should not be approved because it restricts the application of section 124 (d) and, in effect, limits the right to exercise the election provided by section 124 so that no emergency facility can be amortized on the basis of an amortization period which terminates with the end of the emergency period if the emergency facility was disposed of at any time during a taxable year ending in 1945.

It is clear that the Congress intended to make a liberal provision for the amortization of an emergency facility by allowing the amortization at an accelerated rate; and that section 124 was enacted as a relief provision giving taxpayers who invested capital in emergency facilities a more favorable allowance for amortization deductions than

section 23 (1) provided. Ways and Means Committee, H. Rept. No. 2894, 76th Cong., 3d Sess., pp. 16, 38 (1940-2 C. B. pp. 496, 507-8).

Reading section 124 as a whole, the owner of an emergency facility was given the right, if he so elected, to amortize the cost thereof over a period of 60 months, or *less*, from the month following acquisition. In the first instance, the emergency period was categorically fixed at 60 months, or 5 years, by the provisions of section 124 (a) ; but in section 124 (e) (2) provision was made for fixing the date of the termination of the emergency facility by presidential proclamation. Since the event which would terminate the emergency facility could not be known at the time a taxpayer made his election under section 124 (a), it was necessary to provide a method for giving effect to the termination of the emergency facility, retroactively. This was done by allowing a second election to be made under section 124 (d) (1) under which the end of the amortization period would coincide with the end of the emergency period. The provisions of section 124 (d) (4) likewise provided a method for giving retroactive effect to the event—the proclamation ending the emergency period. Such retroactive effect is given by allowing recomputation of the tax for earlier years on the basis of the allowance of amortization deductions in the earlier years, recomputed on the basis of an amortization period of less than 60 months.

The petitioner in this proceeding was in a position to receive the benefits of sections 124 (d) (1) and (4) because he owned the emergency facility during the year in which the emergency period ended. He was in an entirely different position than was the taxpayer in *Ken-Rad Transmitting Tube Corporation*, 10 T. C. 1217, revd. 180 F. 2d 940. In that proceeding the taxpayer corporation acquired emergency facilities during 1942 and 1943, but on June 30, 1943, it transferred all of its assets to its parent corporation, Ken-Rad Tube & Lamp Corporation, in exchange for its outstanding stock—a tax-free exchange—and then went out of existence. The transferee corporation disposed of all of the emergency facility properties by sale for cash on January 2, 1945. Under such facts, we held in the *Ken-Rad* case that the corporation which had owned the emergency facilities, Ken-Rad Transmitting Tube Corporation, was not "able to bring itself within the terms of the statute." The facts in this proceeding differ materially from the facts in the *Ken-Rad* case, and it is, therefore, distinguishable.

To say that the petitioner could not properly compute the amortization deductions on his emergency facility for 1945, in his income tax return for 1945, on the basis of an amortization period ending on September 30, 1945, is wholly unrealistic. The return for 1945 was due after the event had occurred which ended the emergency period. The petitioner knew all of the statutory facts on the basis

of which an adjustment in the length of the amortization period could be made. The Commissioner, in his regulations, has taken the view that "The reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made." Regs. 111, pp. 125, 126; sec. 29.23 (1)–5. He duly notified the Commissioner of his election to take amortization deduction on the basis of the shorter period of, in his case, 32 months; and he actually computed the amortization deduction for 1945 on that basis. If it was proper for the petitioner to make the computation for 1945 on that basis, it must inevitably follow as a matter of logic that he is entitled under the provisions of section 124 (d) (4) to make adjustments for 1942 and 1943 of the amounts of the amortization deductions, retroactively, on the basis of a 32-month period. We so hold, and conclude that the petitioner is entitled, under section 124 (d) (4) to have the tax for the year before us— 1943—recomputed to give effect to the retroactive adjustment of the 1943 amortization deduction.

It is not material under the facts in this proceeding that the property passed from the petitioner during 1945 under a condemnation award by which the petitioner received consideration for the property so taken. We are dealing here with amortization in lieu of depreciation, and the theory involved in the allowance of depreciation deduction applies with equal validity. That theory, as set forth in the Commissioner's regulations, is that a depreciation allowance is necessary because of the *use* of property in the taxpayer's business for the production of income. *Use* of property exhausts the usefulness thereof, and the depreciation (or amortization) allowance is given because "property used in the business, * * *, for the production of income, gradually approaches the point where its usefulness is exhausted." Section 29.23 (1)–2, Regulations 111, p. 124.

Property may be completely depreciated during the period a taxpayer *uses* it in his business, so that when, and if, it is sold, its adjusted basis for computing gain or loss on the sale is zero. The question before us relates to the *rate* of amortization which the petitioner was entitled to adopt for the purpose of the amortization deduction *during the entire period in which he used the property in his business*. The fact that the petitioner received a consideration for the property when it was taken by condemnation does not enter, at all, into the considerations properly to be given to the question of the *rate* of depreciation which the petitioner was entitled to adopt under all of the provisions of section 124 which were intended to provide an accelerated rate of depreciation.[6]

---

[6] See pp. 127, 128 of Hearings before the Committee on Finance on H. R. 10413, Second Revenue Act of 1940 (revised print), Sept. 3, 4, 5, 1940, 76th Cong. 3d Sess.

It is necessary for the parties to make recomputation under Rule 50, in the course of which the petitioner will take into consideration revisions of the *amounts* of the allowances for amortization at the accelerated rate of amortization based upon an amortization period of 32 months which follow from his admission in this proceeding that he erred in (1) failing to add to the basis of the property—the emergency facility—legal fees in the amount of $3,500; (2) in his original understanding that he did not become divested of the title to the property on June 7, 1945, rather than on some later date after September 30, 1945, when the total payments by the United States under the condemnation proceeding were made, this error having been due, according to our understanding, to petitioner's misconception of the rule of law applicable to the condemnation proceeding whereby the date of the passing of title to the United States was June 7, 1945, even though payment in full of the condemnation award was not made until January 1946. The petitioner has admitted here that he was entitled to deduction in his 1945 return for amortization for about 5 months only, January to June 7, 1945. We point out, for the purpose of clarity, that under our conclusion the petitioner would not be entitled to take (and he does not claim) deduction in 1945 for amortization for the period June 8 to September 30, 1945, (the balance of the emergency period) during which months he did not *use* in his business, and did not own, the emergency facility. The question presented relates only to the *rate* of amortization which the petitioner is entitled to use in computing the amounts of the deductions for amortization for the months in which he owned and used the emergency facility, the rate of amortization being dependent upon the length of the amortization period, *i. e.*, either 60 months or 32 months. We point out, further, that the issue presented here did not raise any question about, and the petitioner did not claim, that the correct amortization period was less than 32 months, ending, for example, on June 7, 1945, rather than on September 30, 1945. If a question on that point might be raised, it was not raised in this proceeding, and under our rule that we will consider only questions raised by the pleadings, we have not considered any possible question about a possibly shorter amortization period than 32 months for obtaining the *rate* of amortization.

The respondent's determination is reversed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: It would be hard enough to unearth any distinction from the principle of *Ken-Rad Transmitting Tube Corpora-*

*tion*, 10 T. C. 1217, if the present facts were much more at variance than they are. But in reality, even the facts are almost identical. In both facilities were bought in 1943 and disposed of in 1945. In each the year 1945 is not involved, but 1943 is in issue. In both the transfer in 1945 was prior to the close of the emergency and in each the effort was made to reopen 1943, further accelerate amortization, and recover full cost over a life shortened to conform to the end of the emergency even though the taxpayer no longer owned the property at that time. In *Ken-Rad* we said no but here we say yes.

The fact that in our prior case there was a tax-free liquidation in 1943 with an accompanying intercompany transfer certainly constitutes no discernible distinction for at least three reasons. First, the *Ken-Rad* opinion points out that both the right to accelerated amortization and to a carry-over basis accompanied the transfer, so that taxwise it was comparable to a single ownership. Second, the same reasons given there for relying on the legislative purpose exist here, namely, that the intention was to assure the recovery of cost [1] which was bound to result in both cases, not a windfall tax refund. And third, because petitioner cannot here, any more than in *Ken-Rad*, conform to the technical requirements of the statute.

Congress has plainly said of the Presidential proclamation terminating the emergency: "* * * In such case the amortization period with respect to such facility *shall end with the end of such month* in lieu of the sixty-month period." Sec. 124 (d) (1), Internal Revenue Code. (Emphasis added.) Petitioner cannot end its amortization period with the end of September 1945, as it now freely admits, because it did not then own the facility. Since it cannot bring itself within the express language and underlying purpose of the statute, see *United States* v. *Ludey*, 274 U. S. 295, I think its claim should be denied as it was in the *Ken-Rad* case.

Van Fossan, Turner, and Raum, *JJ.*, agree with this dissent.

---

Raum, *J.*, dissenting: The purpose behind the provisions of section 124 relied upon here was to protect a taxpayer who found himself with a war facility on his hands after the emergency period, where he had not yet fully recouped his basis with respect to such facility. No such circumstances exist here. As of June 7, 1945, petitioner had recovered his unamortized investment in the property. From that time forward, he had no interest in the property, and he had already

---

[1] "Senator George. The whole theory being that they are entitled to get back their cost for a facility constructed primarily and exclusively for national-defense purposes?

"Mr. Sullivan. That is correct, Senator George." Hearings before the Senate Committee on Finance on the Second Revenue Act of 1940, 76th Cong., 3d Sess., p. 128.

recouped, taxwise, his entire basis. It is a distortion of the purpose for which section 124 was enacted to award petitioner the extraordinary benefits which the Court's opinion bestows upon him, and no such result is required by the language of the statute.

As Judge Opper points out, our decision in *Ken-Rad Transmitting Tube Corporation*, 10 T. C. 1217, calls for a similar disposition of the present case. True, the *Ken-Rad* case was reversed by the Court of Appeals in 180 F. 2d 940; but this Court has not accepted that reversal as a correct statement of the law (cf. *American Coast Line* v. *Commissioner*, 159 F. 2d 665, 668–669 (C. A. 2); *Estate of William E. Edmonds*, 16 T. C. 110, 117). The majority opinion herein carefully avoids any attempt to follow the decision of the Court of Appeals. Rather, it seeks to find a distinction between the cases, a distinction that is elusive and unconvincing.

VAN FOSSAN, TURNER, and OPPER, *JJ.*, agree with this dissent.