JAMES M. FIDLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27910. Promulgated September 25, 1953.

*Nelson Rosen, Esq.*, for the petitioner.
*W. Lee McLane, Esq.*, for the respondent.

1082

**OPINION.**

RAUM, *Judge:* 1. Petitioner seeks to deduct the payments of $800 a month made by him to his divorced wife, Ruth Fidler, in accordance with the divorce decree and the agreement between them adopted as part of the decree. Section 23 (u) of the Internal Revenue Code[1]

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

* * * * * * *

(u) ALIMONY, ETC., PAYMENTS.—In the case of a husband described in section 22 (k), amounts includible under section 22 (k) in the gross income of his wife, payment of which is made within the husband's taxable year. * * *

allows a divorced husband to deduct payments made by him to his divorced wife which are includible in her gross income under section 22 (k).[2] The issue herein is whether the payments in controversy were "installment payments discharging a part of an obligation the principal sum of which is, in terms of money or property, specified in the decree or instrument" incident to such decree. If they were such "installment payments," then they are not taxable to the divorced wife as income under section 22 (k), nor are they deductible by the husband under section 23 (u). Respondent contends that the $800 monthly payments constitute nondeductible "installment payments," and, in the alternative, that $500 of each $800 payment is nondeductible.

We think it clear that the $800 monthly payments required by the divorce decree, as amended, consisted of two separate components of $500 and $300, each. Petitioner was obligated to pay $500 a month unconditionally for 53 months, the unexpired period covered by the first two notes under the separation agreement; moreover, he was obligated to pay an additional $300 a month for the same period, depending upon his employment as a radio commentator. If he should fail to obtain subsequent radio contracts, the obligation in relation to the $300 payments was to cease; if he should obtain such contracts with reduced compensation, his obligation to the extent of $300 monthly was to be diminished proportionately. That the $800 payments consisted of these two separate parts is plain not only from the face of the decree, but also from the separation agreement which was explicitly incorporated into the decree by reference.[3]

---

[2] SEC. 22. GROSS INCOME.

(k) ALIMONY, ETC., INCOME.—In the case of a wife who is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, periodic payments * * * received subsequent to such decree in discharge of, * * * a legal obligation which, because of the marital or family relationship, is imposed upon or incurred by such husband under such decree or under a written instrument incident to such divorce or separation shall be includible in the gross income of such wife, * * * Installment payments discharging a part of an obligation the principal sum of which is, in terms of money or property, specified in the decree or instrument shall not be considered periodic payments for the purposes of this subsection; except that an installment payment shall be considered a periodic payment for the purposes of this subsection if such principal sum, by the terms of the decree or instrument, may be or is to be paid within a period ending more than 10 years from the date of such decree or instrument, but only to the extent that such installment payment for the taxable year of the wife * * * does not exceed 10 per centum of such principal sum. * * *

[3] Compare *Edward Bartsch*, 18 T. C. 65, 69, affirmed 203 F. 2d 715 (C. A. 2):

"The plan of payment may have been a single plan, but we do not think that requires us to press the payments under both paragraphs in the same mold when the parties themselves have differentiated them. * * *"

"The divorce decree wrought no change in the tax aspects of the situation. It did no more than carry over into the decree the unfulfilled obligations of petitioner and Sarah under the separation agreement, * * *."

The obligation set forth in the decree was stated to be "in accordance with the terms of * * * [the] Settlement Agreement" of February 4, 1944, and the decree itself expressly approved and "adopted" the agreement as part of the decree. And in the separation agreement, which was thus made part of the decree, petitioner agreed to redeliver to his wife two promissory notes calling unconditionally for payments of $500 a month. These notes were set forth verbatim in the agreement. In addition the agreement required petitioner to execute and deliver a third note, payable in installments of $300 a month over the remaining period covered by the first two notes. The third note, also set forth verbatim in the agreement, explicitly provided for reduction or elimination of the payments thereunder, depending upon petitioner's earnings under radio contract.

We are satisfied that to the extent of $500 a month petitioner's payments are "installment payments" and therefore not deductible. As was said in *Estate of Frank P. Orsatti*, 12 T. C. 188, 191–192:

it is of no importance that under the settlement agreement one must multiply the specified weekly payments by the number of weeks over which they were to be paid to determine the principal sum specified. There is at best only a formal difference between such a decree and one where the total amount is expressly set out. * * *

See also *Frank R. Casey*, 12 T. C. 224, 226; *Harold M. Fleming*, 14 T. C. 1308, 1311.

To the extent of $300 a month it is at least equally obvious that there was a "principal sum" within the meaning of the statute. The obligation to that extent had its inception in the agreement of February 4, 1944, and the third note given pursuant thereto. The note was in the principal amount of $16,200. Petitioner specifically promised to pay to his wife "the sum of Sixteen Thousand, Two Hundred ($16,200.00) Dollars, without interest," in installments of $300 on the "first day of each * * * month subsequent to the first day of March, 1944." The agreement (and notes set forth therein) were explicitly made part of the decree,[4] and it is difficult to see why we do not have here "installment payments discharging a part of an obligation the principal sum of which is * * * specified in the decree or instrument." The words of the statute are plain, and it is clear that the present situation is covered by those words.

Petitioner stresses the fact that his liability in respect of the $300 payments could be reduced or eliminated if he should fail to obtain

---

[4] To the extent that there may be any conflict between provisions of the agreement and other parts of the decree, it is abundantly clear that it was the intention that the agreement was to be controlling. In one respect in which there was such a discrepancy, the decree was thereafter amended to conform to the agreement, as shown in our findings.

future radio contracts with at least the same level of earnings. True, such contingency did exist. But we can find nothing in the language of the statute or the legislative history that would justify refusing to apply the clear statutory provision. A similar contention was considered and rejected in *J. B. Steinel*, 10 T. C. 409; *Estate of Frank P. Orsatti, supra; Harold Fleming, supra.* In *John H. Lee*, 10 T. C. 834, and *Roland Keith Young*, 10 T. C. 724, relied upon by petitioner, no "principal sum" was specified anywhere, and the fluctuating character of the payments was such that it was not thought reasonably possible to spell out a principal sum of an obligation. The *Lee* and *Young* cases were relied upon by the petitioners in the *Orsatti* case, but we held that they "are distinguishable upon the terms of the instruments involved in those cases." 12 T. C. at p. 192.

We are aware that the Court of Appeals for the Second Circuit has recently reversed our decision in *F. Ellsworth Baker*, 17 T. C. 1610, and has rejected the theory of the *Steinel* case. 205 F. 2d 369. We have therefore carefully reexamined our decision in the *Steinel* case, but can find no basis in the statute for refusing to give effect to its plain language. Notwithstanding the great respect that we have for the Court of Appeals, we feel that we must continue to adhere to the theory of the *Steinel* case. Cf. *American Coast Line* v. *Commissioner*, 159 F. 2d 665, 668–669 (C. A. 2); *Estate of William E. Edmonds*, 16 T. C. 110, 117.

2. The remaining issue relates to the loss of $4,750 sustained by petitioner upon the sale in 1945 of the books and manuscripts he acquired from Selig.

The petitioner contends that the respondent erred in treating the loss sustained as a long-term capital loss from the sale or exchange of "capital assets"; that the literary properties sold fell within those types of property which were expressly excluded from "capital assets" in section 117 (a) (1), i. e., "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *"; and that the loss was an ordinary business loss deductible in full under the provisions of section 23 (e).

Section 23 (e) provides that in computing net income of individuals there shall be allowed as deductions losses sustained during the taxable year (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with trade

or business. Section 23 (g) provides that losses from sales of capital assets shall be allowed only to the extent provided in section 117.[5]

Petitioner bought the literary properties in question from William N. Selig in 1937 and sold them in 1945. During that 8-year period he never consummated a sale of any of them. While he testified that he and Bentel made efforts to sell various books and stories to some of the motion picture studios, when asked on cross-examination to name some of the prospects approached regarding their sale, he replied:

A. I don't know that I could specify with stories, to which studios. There were several stories involved, several books involved, and some of them were hot and some were cold. One in particular that was hot, that we thought was sold, was a book called "Under Two Flags". I believe that was the title.

The book called "Under Two Flags", Mr. Bentel and I both believed that the sale—and I think the sale was to have been to RKO, we both believed the sale was in the bag. About that time another studio made a motion picture, which they titled "Under Two Flags", and it kayoed, or whatever you want to call it—it stopped our sale.

It is upon such evidence that the petitioner relies to show that he was engaged in trade or business with respect to the literary properties. We are satisfied on the record before us that petitioner's only business or occupation was that of radio commentator and newspaper columnist. He did not purchase the literary properties for use in that business. While it is true that an individual may engage in more than one busi-

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business;

* * * * * * *

(5) LONG-TERM CAPITAL LOSS.—The term "long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such loss is taken into account in computing net income;

* * * * * * *

(b) DEDUCTION FROM GROSS INCOME.—In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * *.

* * * * * * *

(d) LIMITATION ON CAPITAL LOSSES.—

* * * * * * *

(2) OTHER TAXPAYERS.—In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer or $1,000, whichever is smaller. For purposes of this paragraph, net income shall be computed without regard to gains or losses from sales or exchanges of capital assets. If the tax is to be computed under Supplement T, "net income" as used in this paragraph shall be read as "adjusted gross income".

ness, he has not established that he did so. He made an investment in the literary properties with the hope or expectation of selling them at a profit. That hope or expectation was never realized during the period from 1937 to 1945. The only sale of any of these properties ever made by him was the sale in 1945 to one of his employees. He may have held them for sale, but not "primarily for sale to customers in the ordinary course of his trade or business." He did not or could not show any activity from which we can find that he engaged in a trade or business with respect to the literary properties. Neither did he show that these properties constituted stock in trade or property of a kind which would properly be included in inventory. See section 22 (c), Internal Revenue Code. The properties in which he invested were held by him for more than 6 months, and inasmuch as he has not proved that they fell within the types of property excluded from the term "capital assets" in section 117 (a) (1), the respondent did not err in determining that the loss sustained upon their sale was a loss from the sale of capital assets and subject to the provisions of section 117 (b) and (d). Had petitioner sold the literary properties at a profit, he would no doubt have claimed that they were capital assets and that he would have been entitled to the favorable treatment accorded to capital gains. We think that these properties did constitute capital assets, and that petitioner must accept whatever tax disadvantages attach to such assets when they are sold at a loss.

Reviewed by the Court.

*Decision will be entered for the respondent.*