UNITED STATES *v.* KOPPERS COMPANY, INC.

NO. 29.

Argued November 10, 1954.—Decided January 31, 1955.

*Hilbert P. Zarky* argued the causes for the United States. With him on the briefs were *Solicitor General Soboloff, Assistant Attorney General Holland, Ellis N. Slack* and *Harry Baum. Ralph S. Spritzer* was also with them on the brief in No. 41.

*David W. Richmond* argued the cause for respondent in No. 29. With him on the brief were *Robert N. Miller, Frederick O. Graves, John M. Crimmins, E. S. Ruffin, Jr.* and *C. M. Crick.*

*William A. Sutherland* argued the cause for petitioner in No. 41. With him on the brief were *Eugene M. Locke, Harold B. Pressley, Jr.* and *Mac Asbill, Jr.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The issue in these cases is whether, for the years 1940 through 1945, abatements of federal excess profits taxes, through application of I. R. C., § 722,[1] are retroactive.

---

[1] "SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVER-AGE BASE PERIOD NET INCOME.

"(a) GENERAL RULE.—*In any case in which the taxpayer establishes that the tax computed under this subchapter* [as to excess profits tax, § 710 *et seq.*] (*without the benefit of this section*) *results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income* for the purposes of

For the reasons hereafter stated, we hold that they are not and that they relieve taxpayers from the payment of interest on deficiencies in such taxes from the time of the abatements, rather than from the original due dates of the taxes abated.

In No. 29, *United States* v. *Koppers Co.*, the taxpayer, respondent therein,[2] reported and paid excess profits taxes of $6,512.76 for 1940, and $1,781,288.14 for 1941.[3] In

---

an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, *the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income* otherwise determined under this subchapter. . . .

.          .          .          .          .

"(d) APPLICATION FOR RELIEF UNDER THIS SECTION.—*The taxpayer shall compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application of this section, except as provided in section 710 (a) (5).* The benefits of this section shall not be allowed unless the taxpayer within the period of time prescribed by section 322 and subject to the limitation as to amount of credit or refund prescribed in such section makes application therefor in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. If a constructive average base period net income has been determined under the provisions of this section for any taxable year, the Commissioner may, by regulations approved by the Secretary, prescribe the extent to which the limitations prescribed by this subsection may be waived for the purpose of determining the tax under this subchapter *for a subsequent taxable year."* (Emphasis supplied.) 56 Stat. 914–915, as amended, 57 Stat. 601–602, 26 U. S. C. § 722 (a) (d).

The above provisions of § 722 (d) apply to taxable years beginning after December 31, 1939. 57 Stat. 602.

[2] Koppers Company, Inc., is, in fact, the successor to Koppers United Company and its subsidiaries, which filed consolidated excess profits tax returns for the years in question. For convenience, all of such corporations are referred to as the taxpayer.

[3] This tax was computed and paid pursuant to the Excess Profits Tax Act of 1940, 54 Stat. 975, as amended. See I. R. C., § 710 *et seq.* On November 8, 1945, these provisions became inapplicable to any calendar year beginning after 1945. 59 Stat. 568.

computing these taxes, it used excess profits credits based upon invested capital.[4] In 1943 and 1945, it applied under § 722 for relief from all or part of these taxes, claiming that they were "excessive and discriminatory."[5] In accordance with the usual administrative practice, the Commissioner determined the amount of the excess profits taxes due without regard to the application for relief under § 722. In doing so, he found it necessary to proceed under I. R. C., § 713, using excess profits credits based upon the taxpayer's income, rather than upon its invested capital. As a result he found that the above taxes, as returned and paid by the taxpayer without reference to § 722, had been understated and that the following deficiencies existed as of their original due dates, March 15, 1941, and 1942:

| | 1940 | 1941 |
|---|---|---|
| Excess profits tax under §§ 710 (a) and 713 | $466,921.67 | $2,208,019.09 |
| Payments | 6,512.76 | 1,781,288.14 |
| Deficiencies | 460,408.91 | 426,730.95 |

The Commissioner computed interest, at 6%, on the above deficiencies, amounting to $217,376.07 for 1940, and $230,504.86 for 1941.[6]

After extended investigations and negotiations conducted under authority of § 722, the Commissioner and

---

[4] Two methods of computation of the excess profits credit were authorized: the invested capital method under I. R. C., § 714, or the base period income method under I. R. C., § 713.

[5] By timely consents, the Commissioner and the taxpayer agreed that the amount of any income, excess profits, or war profits tax due for 1940 and 1941 could be assessed at any time on or before June 30, 1951.

[6] The interest on the 1940 tax ran from March 15, 1941, to January 28, 1949, which was treated as the date of its payment; that on the 1941 tax ran from March 15, 1942, to March 16, 1951, which was 30 days after the filing of a waiver consenting to the assessment and collection of the deficiencies finally determined. See I. R. C., § 292 (a), *infra,* note 12.

the taxpayer agreed upon a "constructive average base period net income" which fixed the excess profits credits for the years in question and, as a result, the relief available under § 722. After this agreement was approved by the Excess Profits Tax Council of the Bureau of Internal Revenue, the Commissioner determined that the above-stated deficiencies, with the benefit of § 722, should be reduced to $260,554.39 for 1940, and to $95,749.33 for 1941. The taxpayer consented to the assessment of these deficiencies, with interest as provided by law. Whereupon, the Commissioner issued a formal determination of them and assessed them against the taxpayer. He also assessed the above-stated interest charges, based upon the full amount of the original deficiencies.

The taxpayer paid the deficiencies and interest so assessed but claimed refunds of $94,358.71 for 1940, and $178,784.48 for 1941. Those sums represented the interest on the abatements in its excess profits taxes made under § 722. When the Commissioner disallowed the claims, the taxpayer sued in the Court of Claims to recover their amounts. With one judge dissenting, that court deducted a setoff and rendered judgment in favor of the taxpayer for $270,216.34. 126 Ct. Cl. 847, 117 F. Supp. 181. To resolve the resulting conflict with *United States v. Premier Oil Co.,* 209 F. 2d 692, we granted certiorari, 347 U. S. 965.

In No. 41, *Premier Oil Co.* v. *United States,* the taxpayer, petitioner therein, paid the excess profits taxes shown on its original returns in the following amounts: for 1943, $564,167.70 (adjusted to $560,484.84); for 1944, $353,292.15 (adjusted to $313,639.13); and for 1945, $45,679.67. Thereafter, several deductions which the taxpayer had made from its income were disallowed, resulting, in 1948, in the following deficiencies in its payment of its excess profits and income taxes as of their original due dates:

DEFICIENCIES WITHOUT THE APPLICATION OF § 722. ·

| Deficiencies in excess profits tax, under §§ 710 (a) and 713 ... | 1943 | 1944 | 1945 |
|---|---|---|---|
| | $78,359.80 | $55,529.92 | $190,785.32 |
| Deficiencies in income tax... | 9,060.07 | 9,178.01 | (90.00) |
| Total deficiencies ........... | 87,419.87 | 64,707.93 | 190,695.32 |

The Commissioner computed interest, at 6%, on the above excess profits tax deficiencies as follows:

For 1943—on $78,359.80, March 15, 1944, to June 23, 1948 ......................................... $20,084.79
For 1944—on $55,529.92, March 15, 1945, to June 23, 1948 ......................................... 10,901.36
For 1945—on $190,785.32, March 15, 1946, to June 19, 1948 ......................................... 25,869.26

Total ......................................... 56,855.41

In the meantime, the taxpayer had applied for relief under § 722, seeking acceptance of a "constructive average base period net income" of $357,000 for each of the years at issue. The Excess Profits Tax Council approved that figure as a credit in lieu of $93,150.36 for each of the years 1943 and 1944, and of $116,437.95 for 1945. This credit so far reduced the taxpayer's taxable excess profits as to abate its excess profits tax deficiencies for 1943 and 1944 entirely, and that for 1945 to $366.52.[7] Accordingly, the

[7] ABATEMENT OF EXCESS PROFITS TAX DEFICIENCIES UNDER § 722.

| Deficiencies without application of § 722..... | 1943 | 1944 | 1945 |
|---|---|---|---|
| | $78,359.80 | $55,529.92 | $190,785.32 |
| (Decreases) under § 722. | (175,307.78) | (175,174.49) | (190,418.80) |
| Resulting (credits) and deficiency ........... | (96,947.98) | (119,644.57) | 366.52 |

By reducing that part of the taxpayer's income that was subject to excess profits taxes, this application of § 722 automatically left more of the taxpayer's income subject to the normal tax and surtax. Those increases in the taxpayer's income taxes and their consequences are not before us.

Commissioner's assessment of the remainder of the tax-payer's deficiencies in excess profits taxes was for only $366.52. However, as in the *Koppers* case, *supra,* he assessed against the taxpayer the full amount of the interest charges based upon the original deficiencies.

The taxpayer paid the deficiency and interest so assessed but claimed refunds totaling $56,855.41. That sum represented the interest on the abatements in its excess profits taxes made under § 722. When the Commissioner disallowed those claims, the taxpayer brought the instant action to recover their amounts, in the United States District Court for the Northern District of Texas, under 28 U. S. C. § 1346 (a)(1). That court rendered judgment for the taxpayer.[8] 107 F. Supp. 837. The Court of Appeals reversed. 209 F. 2d 692. We granted certiorari to resolve the conflict with *United States* v. *Koppers Co., supra.* 347 U. S. 987.[9]

As the underlying issue is the same in each case and for each year, we shall discuss it in relation to the 1940 taxes in the *Koppers* case. There, the taxpayer, under the usual procedure, computed and paid the excess profits tax of $6,512.76 shown on its return for 1940. In due course the Commissioner, without the application of § 722, determined that the payment should have been $466,921.67,

---

[8] The original judgment for $56,855.41 was modified to $52,292.40 to reflect several adjustments, including the deduction of $49.72, representing interest on the unabated deficiency of $366.52 upon which the taxpayer conceded that interest was chargeable.

[9] The grant was limited to the following question stated in the petition:

"Where a deficiency in excess profits tax, based on the income and credits as shown in the taxpayer's return, would have existed except for the subsequent application of Section 722 of the Internal Revenue Code, is the taxpayer liable for interest on the amount of such deficiency (hereinafter called the 'potential deficiency') which would have existed had it not been extinguished by the application of Section 722?" 347 U. S., at 988.

and, therefore, that a deficiency of $460,408.91 was due the United States, with interest from March 15, 1941. I. R. C., §§ 53 (a), 56 (a). If the taxpayer had made no application for relief under § 722, there is no doubt that such interest would have remained due the United States until paid and that, when paid, it would not have been refundable. The same would have been true if the taxpayer's application for relief under § 722 had been finally denied. The taxpayer contends, however, that, because the Commissioner has abated the taxpayer's deficiency from $460,408.91 to $260,554.39 under § 722, such reduction is necessarily retroactive to March 15, 1941, and that the taxpayer, accordingly, is entitled to a refund of the interest on the sum abated. The Commissioner, on the other hand, contends that the determination under § 722 is not retroactive but is a current abatement effective when made.

Congress could have prescribed either treatment but did not expressly specify either. Our answer is determined from our consideration of the statutory scheme as a whole, the related provisions of the statute, the legislative history of § 722 and the administrative interpretation that has been given the statute.

1. *The statutory scheme as a whole.*

The excess profits tax was a device initiated by Congress, late in 1940, in great part for the quick collection of large sums needed by the Government in a national emergency. Congress sought to obtain those funds from abnormally high corporate profits while such profits were available. To that end, it prescribed computations of unusual profits and required prompt payment of the taxes on them.[10]

---

[10] I. R. C., § 713—on the basis of income, or I. R. C., § 714—on the basis of invested capital. I. R. C., § 721, authorized standard allowances for specified abnormalities. No return by the taxpayer under I. R. C., § 722, was permissible.

From the beginning, the statute also provided, in § 722, a means of subsequent adjustment of the tax in special instances where the normal computation of the tax was found to result in inequity. The adjustment could be made only after administrative action and, pending its consideration, it did not eliminate the tax return or the tax payment otherwise required. Until 1942, it did not permit even the postponement of the payment of any part of the standard tax. Indeed, the full payment of that tax soon was made an express condition of the application for adjustment. I. R. C., § 722 (d). In 1943, Congress stated that if overpayments for either of the taxable years 1940 or 1941 were found to be attributable to § 722, no interest on such overpayments was to be paid the taxpayer.[11] At least to that extent, Congress expressly recognized that the funds paid as excess profits taxes, when due and without the benefit of § 722, were funds owed to and usable by the Government.

The significance of this statutory scheme further appears when it is applied to the instant case. If the instant taxpayer had paid its required tax in 1941, the Government would have received an additional $460,408.91 at that time. Accordingly, it would have had the use of that money, without charge, during the crucial war years. Correspondingly, the taxpayer would have been without that money during the same period. Instead, the taxpayer, in fact, retained the funds for its own use and now contends that it need not compensate the Government for such use of a substantial part of it.

While in the instant case the taxpayer did not underpay any amount actually shown on its return, as contemplated by I. R. C., § 294 (a), it understated its tax and thus withheld the amount in question. The detriment to the Government and benefit to the taxpayer was the same—the use of $460,408.91 for eight years. The above

---

[11] I. R. C., § 3771 (g), infra, note 15, discussed at 266–267, infra.

distinction, emphasized by the taxpayer, may have helped it in initiating its application for relief under § 722 (d) because it could establish that, at least, it had paid "the tax shown on its return." The distinction, however, supplies no ground for different results once the deficiencies have been determined. We find no implication that a self-serving error in the understatement of its tax on its tax return entitles the taxpayer to a greater ultimate tax advantage than does a self-serving error of the same size in the underpayment of the same tax. *A fortiori* we find nothing to justify a greater tax advantage to any taxpayer that underpays its correct tax, over one that pays such tax in full when due.

2. *The interest here in controversy is attributable to I. R. C., § 292 (a).*[12]

The interest here in controversy was due under § 292 (a) from March 15, 1941, until paid. Accordingly, to obtain a refund of it, the taxpayer must sustain the proposition that the tax relief granted under § 722 is necessarily retroactive, extinguishing the deficiency as of the original due date of the tax and thus eliminating the interest charges for the corresponding period. To that end, the taxpayer emphasizes the statement in § 722 (a) that, as a condition of securing the application of § 722, a taxpayer must establish that the usual procedure "re-

---

[12] "SEC. 292. INTEREST ON DEFICIENCIES.

"(a) GENERAL RULE.—Interest upon the amount determined as a deficiency shall be assessed at the same time as the deficiency, shall be paid upon notice and demand from the collector, and shall be collected as a part of the tax, at the rate of 6 per centum per annum from the date prescribed for the payment of the tax (or, if the tax is paid in installments, from the date prescribed for the payment of the first installment) to the date the deficiency is assessed, or, in the case of a waiver under section 272 (d), to the thirtieth day after the filing of such waiver or to the date the deficiency is assessed whichever is the earlier." 53 Stat. 88, as amended, 57 Stat. 602, 26 U. S. C. § 292 (a).

sults in an excessive and discriminatory tax" and also must establish "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income." Once the taxpayer has done that, "the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter." Standing alone, this directive language is elastic. It can be read consistently either with the interpretation that the new computation replaces and abates the old one currently, when the new one is determined and assessed, or that it retroactively replaces the old tax from its original due date. It leaves the issue open for disposition by the effect of other clauses relating more specifically to the issue. For the reasons hereafter stated, we read it as looking forward, rather than backward.[13]

3. *I. R. C., § 710 (a)(5),*[14] *permits a taxpayer, seeking relief under § 722, to defer a part of its existing excess profits taxes where its adjusted excess profits net income exceeds 50% of its normal tax net income.*

In 1942, Congress added § 710 (a)(5), conditionally authorizing partial deferment of the tax in cases where a

---

[13] Section 722 (d) looks forward when it provides that if a constructive base period net income has been determined under § 722 for any taxable year, the Commissioner may, by regulations approved by the Secretary, permit waivers of the section's limitations for the purpose of determining excess profits taxes for a subsequent taxable year. Even this effect is not automatic, whereas it might have been expected to be so if the adjustment were a retroactive correction of the standard excess profits credit.

[14] "SEC. 710. IMPOSITION OF TAX.

"(a) . . .

.        .        .        .        .

"(5) DEFERMENT OF PAYMENT IN CASE OF ABNORMALITY.—If the adjusted excess profits net income (computed without reference to

taxpayer claimed benefits under § 722. The condition was that the taxpayer's "adjusted excess profits net income (computed without reference to section 722)" must exceed 50% of the taxpayer's normal tax net income for the year. Even then, deferment was limited to 33% of the benefit claimed under § 722. If a taxpayer, without this amendment, could have successfully deferred payment and avoided interest charges by following the course taken in the instant cases, it could, by understatement of its tax, have deferred, without incurring interest charges, the payment of a corresponding part of its tax pending relief. If so, there would have been little need for § 710 (a)(5). The 1942 amendment, by its restrictions, fairly meant that, under all other circumstances, the existing taxes were to be paid when due, or be subjected to interest during their delinquency under § 292 (a).

---

section 722) for the taxable year of a taxpayer which claims on its return, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, the benefits of section 722, is in excess of 50 per centum of its normal tax net income for such year, computed without the credit provided in section 26 (e) (relating to adjusted excess profits net income), the amount of tax payable at the time prescribed for payment may be reduced by an amount equal to 33 per centum of the amount of the reduction in the tax so claimed. For the purposes of section 271, if the tax payable is the tax so reduced, the tax so reduced shall be considered the amount shown on the return." 54 Stat. 975, as amended, 56 Stat. 917, but see also, later amendment indicated by 26 U. S. C. § 710 (a)(5).

The Senate Committee on Finance Report accompanying the Revenue Act of 1942, 56 Stat. 798, stated:

"Although it is believed advisable to require a taxpayer seeking relief under section 722 to compute and pay its tax without the benefit of such section, there are some cases in which it would be inequitable to compel the taxpayer to pay the entire amount of such tax. Section 710 (a) is therefore amended to provide . . . [as above quoted]." S. Rep. No. 1631, 77th Cong., 2d Sess. 205.

### 4. *The denial of interest on refunds is prescribed by I. R. C., § 3771 (g).*[15]

Although § 3771 (g) was not enacted until 1943, it was then made applicable to taxable years before, as well as after, January 1, 1942. It denied all interest on refunds attributable to § 722 where the refunds related to the taxable years 1940 or 1941. It also denied interest on refunds relating to taxable years beginning after January 1, 1942, but limited such denials to the first year after the filing of an application for relief under § 722, or to periods prior to September 16, 1945 (two years after the effective date of the amendment), whichever was the later.[16]

---

[15] "SEC. 3771. INTEREST ON OVERPAYMENTS.

. . . . .

"(g) CLAIMS BASED UPON RELIEF UNDER SECTION 722.—If any part of an overpayment for a taxable year beginning prior to January 1, 1942, is determined by the Commissioner to be attributable to the final determination of an application for relief or benefit under section 722 for any taxable year, no interest shall be allowed or paid with respect to such part of the overpayment. If any part of an overpayment for a taxable year beginning after December 31, 1941, is determined by the Commissioner to be attributable to the final determination of an application for relief or benefit under section 722 for any taxable year, no interest shall be allowed or paid with respect to such part of the overpayment for any period prior to one year after the filing of such application, or September 16, 1945, whichever is the later." 53 Stat. 465, as amended, 57 Stat. 602, 26 U. S. C. § 3771 (g).

[16] The same Act added I. R. C., § 292 (b), containing comparable provisions prohibiting the assessment of interest upon deficiencies attributable to the final determination of an application for relief under § 722. 53 Stat. 88, as amended, 57 Stat. 602, 26 U. S. C. § 292 (b). This applied, for example, to deficiencies in the payment of ordinary income taxes resulting from an abatement under § 722 of excess profits taxes. Such an abatement automatically would leave a larger portion of a corporation's taxable income subject to the

In cases where the Government has authorized refunds of excess profits taxes overpaid to it by reason of the abatement of taxes attributable to § 722, § 3771 (g) expressly precludes the payment of interest by the Government upon the amounts abated. This treats the Government as entitled to the use of the abated amounts between the time of their overpayment and that of their abatement. Equity demands a comparable result in the case of underpayments. Where unpaid taxes are abated by reason of § 722, the taxpayer then receives a release from its existing obligation to pay the amount abated. However, the Government having been entitled, up to that time, to collect and use the sum abated, the Government should receive interest, on the abated sum, for the period during which the Government was entitled to have its use. This is the natural counterpart of the Government's freedom from paying interest on refunded overpayments.

### 5. *The legislative history of § 722.*

The excess profits tax was initiated in 1940. 54 Stat. 975 *et seq.* It provided for prompt payment of large taxes computed on income reflecting unusual profits. Computation of the tax on the basis of the taxpayer's prior income or invested capital was prescribed in §§ 713 and 714. A standardized treatment of abnormalities was provided in § 721. In addition, § 722 authorized the Commissioner "to make such adjustments as may be necessary to adjust abnormalities affecting income or capital." 54 Stat. 986. The procedure under § 722 was formalized by the Excess Profits Tax Amendments of 1941, 55 Stat.

---

normal income tax and surtax. This increase, however, was not made retroactive any more than the decrease in the excess profits tax which caused it was made retroactive. Congress thus appropriately charged no interest on the resulting deficiency just as it had allowed none on the related overpayment.

23-25, and put in its final form by the Revenue Act of 1942, 56 Stat. 914–917, as amended, 57 Stat. 601–602. The technical and discretionary nature of the adjustment was emphasized by the provision that the determination of most computations under § 722 was reviewable only by a special division of the Tax Court constituted for the occasion and by no other court or agency. 55 Stat. 26, as amended, 56 Stat. 917, 59 Stat. 295, 673, 26 U. S. C. § 732. A taxpayer never was permitted to file a return of its own under § 722. S. Rep. No. 75, 77th Cong., 1st Sess. 13; H. R. Rep. No. 146, 77th Cong., 1st Sess. 13.

The statute has been interpreted as authorizing a procedure that is in the nature of a claim for a refund preceded by long investigations of complicated special circumstances, and followed by extended negotiations between the Commissioner and taxpayer to develop a mutually satisfactory "constructive average base period net income." This interpretation leaves the usual procedure under § 710 *et seq.* complete in itself but subject, upon application, to ultimate adjustment in instances accepted by the Commissioner under § 722.[17] We find no statement of a purpose that § 722 shall relieve taxpayers from penalties or interest charges due either to their defaults in paying, or their errors in computing, their taxes. On the contrary, it has been suggested that Congress considered relief under § 722 to be in the nature

---

[17] When Congress, in a later Act, authorized deferment of payments of comparable taxes pending determinations of applications for relief, it did so unequivocally. The relief provisions in the Excess Profits Tax Act of 1950, 64 Stat. 1137, adding I. R. C., §§ 430–472, prescribed formulas for determining a substitute average base period net income, §§ 442–446, and permitted the taxpayer to adjust its base period net income at the time the return was filed, § 447 (e). See S. Rep. No. 2679, 81st Cong., 2d Sess. 17–21, discussing the general relationship between these provisions and the experience gained under § 722 now before us.

of a favor and as not relieving the taxpayer of its duty to pay the original tax when due.[18]

The regulations do not deal specifically with the issue before us but, from their beginning, in Treasury Regulations 109, they have been consistent with the interpretation given the Act by the Government. See § 30.722–5, as added by T. D. 5264, 1943 Cum. Bull. 761, as amended, T. D. 5393, 1944 Cum. Bull. 415. In addition to the practice of the Commissioner in the instant cases, there is in the record of the *Premier Oil Co.* case an undisputed affidavit by a Treasury Department reviewer to the effect that the policy followed was the administrative policy of the Bureau:

"It is the policy of the Bureau of Internal Revenue in those cases where all or any part of a tax defi-

---

[18] See legislative history outlined in *American Coast Line* v. *Commissioner,* 159 F. 2d 665, and *Pohatcong Hosiery Mills* v. *Commissioner,* 162 F. 2d 146.

". . . there is no doubt a difference between a tax, conceded to be due in the corporation's own return, and a tax assessed against it in invitum. This argument might perhaps be persuasive, if the denial of 'benefits' under § 722 were regarded as a constituent factor of the tax itself, as for example are the conditions detailed in § 721. We do not so regard § 722; on the contrary it was a favor; it presupposed that, even after taking into account the ameliatory conditions of § 721, the tax was due unless ex gratia the blow was softened; it was a tempering of the wind to the shorn lamb." Circuit Judge Learned Hand, for the court, 159 F. 2d, at 668. See also, *Ideal Packing Co.* v. *Commissioner,* 9 T. C. 346, 349; *Uni-Term Stevedoring Co.* v. *Commissioner,* 3 T. C. 917, 918.

"In each instance the section [722] provided that a hypothetical base period earnings credit be 'tailor made' for the particular taxpayer and that certain assumptions be made in connection with the case. Each case was a problem in research, and the legal or tax result generally was intertwined with complicated accounting and economic problems. Almost every factor which had any influence on the particular business was pertinent to the case and the time and expense involved in reconstructing the average base period earnings credit were tremendous." S. Rep. No. 2679, 81st Cong., 2d Sess. 17.

ciency has been extinguished by application of the relief provisions of Section 722 of the Internal Revenue Code not to assess the extinguished portion of such deficiency. *However, interest has been computed and assessed on the extinguished portion of the deficiency* from the due date of the return to the thirtieth day after the agreement, Form 874, is filed or date of assessment, whichever is the earlier." (Emphasis supplied.)

While *Manning* v. *Seeley Tube & Box Co.*, 338 U. S. 561, relates to the carry-back provisions of the Internal Revenue Code, it is thoroughly consistent in principle with the above discussion. There the Court upheld the collection of interest on a deficiency which later was extinguished by carrying back a loss which occurred in a subsequent year. It treated the carry-back as a current adjustment of the tax previously determined, characterizing it as an "abatement" at 565. It recognized I. R. C., § 3771 (e), as a help to the interpretation of the statute, much as we recognize I. R. C., § 3771 (g), as a help here. See 567–568. The Court also there announced that "In the absence of a clear legislative expression to the contrary, the question of who properly should possess the right of use of the money owed the Government for the period it is owed must be answered in favor of the Government." *Id.*, at 566.[19]

While the deficiency for 1940 in the amount of $460,408.91 was properly determined without reference to § 722 and treated as a deficiency for that year by the Commissioner, it was not separately assessed as such. This was not necessary because, at the time of its deter-

---

[19] See also, *Standard Roofing & Material Co.* v. *United States,* 199 F. 2d 607; *Rodgers* v. *United States,* 123 Ct. Cl. 779, 108 F. Supp. 727; *Cumberland Portland Cement Co.* v. *United States,* 101 F. Supp. 577, aff'd, 202 F. 2d 152.

mination and before its assessment, it was abated to $260,-554.39. The latter sum, with interest in the amount of $217,376.07 computed on the whole deficiency of $460,-408.91, was correctly and adequately assessed and paid.[20]

For the foregoing reasons, we conclude that the Government, in each case, is entitled to retain the interest now in controversy. Therefore, in No. 29, the judgment of the Court of Claims is reversed and, in No. 41, the judgment of the Court of Appeals is affirmed.

*No. 29—Reversed.*
*No. 41—Affirmed.*

MR. JUSTICE REED and MR. JUSTICE DOUGLAS dissent.

---

[20] See *Rodgers* v. *United States, supra; Cumberland Portland Cement Co.* v. *United States, supra.*